IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | 3:16-CR-91 |
| | : | (JUDGE MARIANI) |
| RAFAEL LORA, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Defendant, Rafael Lora, is charged with conspiracy to possess with intent to

distribute 500 grams or more of cocaine, 21 U.S.C. § 846, possession with intent to

distribute cocaine, 21 U.S.C. § 841(a)(1), managing a drug premises, 21 U.S.C. § 856(a)(2),

and unlawful use of a cell phone in facilitating the commission of a felony, 21 U.S.C. §

843(b). (Doc. 159). Presently before the Court is Defendant's Motion to Suppress

Evidence ("Motion to Suppress"), where Defendant seeks to suppress evidence obtained

from the search of a mailed package sent from outside of the country to him and from the

search of his home and his cell phone, as well as to suppress statements made by

Defendant while being questioned by law enforcement in his home. (Doc. 183). Briefs were

submitted by Defendant (Doc. 187) and the Government (Doc. 190), and the Court held an

evidentiary hearing on November 13, 2018. After the release of the transcript from the

hearing (Doc. 202), the parties provided additional briefing to the Court. (Doc. 206, Doc.

209, Doc. 210). For the reasons that follow, the Court will deny Defendant's Motion to Suppress.

## II. Finding of Facts

The Court finds the following facts based on the undisputed facts listed in the parties' briefing and the testimony and evidence presented at the November 13, 2018 evidentiary hearing. (*See* Doc. 187, Doc. 190, Doc. 198, Doc. 200, Doc. 202, Doc. 206, Doc. 209, Doc. 210).

On March 17, 2015, Customs and Border Patrol ("CBP") inspectors at JFK International Airport in New York, NY intercepted and examined a package originating from the Dominican Republic and addressed to Defendant at his home at 710 Peace Street, Hazelton, PA (the "Peace Street residence"). (Doc. 187 at 1, Doc. 190 at 2, Doc. 198). The CBP inspectors opened the package and tested a white powdery substance, which ultimately tested positive for cocaine. (Doc. 187 at 1, Doc. 190 at 2).

Based on this finding and as supported in affidavits from law enforcement, on March 20, 2015, law enforcement agents obtained two search warrants from Middle District of Pennsylvania Magistrate Judge Mehalchick. (Doc. 187 at 1, Doc. 190 at 3-4, Doc. 198-1, Doc. 198-2). One warrant was a "tracking" warrant, which authorized the use of a GPS tracking device on the package and an entry-detection device which would alert law enforcement when the package was opened. (Doc. 187 at 1, Doc. 190 at 3-4, Doc. 198-1). The other warrant was an anticipatory search and seizure warrant which would permit law

enforcement agents to enter and search the Peace Street residence if the package was successfully delivered there. (Doc. 187 at 1, Doc. 190 at 3, Doc. 198-2 at 7-8).

The same day the warrants were issued, law enforcement agents attempted to conduct a controlled delivery of the package to the Peace Street residence, but were not able to complete the delivery. (Doc. 187 at 2, Doc. 190 at 3-4, Doc. 198-3 at 10-11). Both the tracking warrant and the anticipatory search and seizure warrant were reissued by Magistrate Judge Mehalchick one week later, on March 27, 2015, to permit law enforcement to make a second attempt to deliver the package. (Doc. 187 at 2, Doc. 190 at 4, Doc. 198-3, Doc. 198-4, Doc. 202 at 59:17-25).

On the morning of March 30, 2015, law enforcement agents attempted a second controlled delivery of the package to the Peace Street residence. Defendant answered the door and accepted the package into the residence. However, the entry-detection device was not activated at that time, and the package was not removed from the residence. (Doc. 187 at 2, Doc. 190 at 4, Doc. 202 at 11:9-20). Several hours later, a vehicle with New York license plates arrived at the Peace Street residence, and a man, woman, and child exited the vehicle and entered the Peace Street residence. Within fifteen minutes, the entry-detection device was triggered, notifying law enforcement that the package had been opened. (Doc. 187 at 2, Doc. 190 at 4, Doc. 202 at 40:7-22, 60:17-61:6).

Law enforcement agents subsequently entered the Peace Street residence to execute the anticipatory search and seizure warrant. Testimony at the November 13, 2018

3

hearing indicated that at least ten law enforcement agents entered the residence after knocking and announcing their presence and breaking the door with a battering ram to gain entry after no one inside answered the door. (Doc. 202 at 22:2-6, 41:8-17, 50:3-8, 62:4-11). Inside the house was Defendant, co-Defendant Luis Santos, at least two children, and two women (Defendant's sister, who is also Santos' wife, and Defendant's wife). (*See* Doc. 190 at 4-5, Doc. 202 at 23:1-6, 43:14-20).

After entering the residence, law enforcement agents did a security sweep of the house to ensure agent safety. (Doc. 202 at 43:12-13, 64:3-7). According to the testimony of law enforcement agents at the November 13, 2018 hearing, during this security sweep, only Defendant and co-Defendant were placed in handcuffs. (Doc. 202 at 44:4-7, 63:21-25). At some point before his interview by law enforcement agents, Defendant's handcuffs were removed. (Doc. 202 at 15:20-22, 64:23-65:4).

Law enforcement agents also testified that Defendant voluntarily agreed to be interviewed as the search of the Peace Street residence was underway. (Doc. 202 at 64:10-11). Postal Inspector David Heinke and Homeland Security Investigations ("HSI") Special Agent Edward Troy conducted most of the interview while the remaining law enforcement agents searched and secured the rest of the Peach Street residence. (Doc. 202 at 16:7-16, 67:4-7). Law enforcement agents testified that, initially, Defendant was not a suspect in criminal activity and that they were just seeking information regarding the

4

package. (Doc. 202 at 17:15-18, 68:12-22 (testifying that Defendant was initially viewed as "a witness or an unwitting participant in what had occurred that day")).

Law enforcement interviewed Defendant in an upstairs children's bedroom. The bedroom contained two twin beds, with a dresser located between the beds. (Doc. 202 at 15:12-16). Defendant was not provided *Miranda* warnings at the beginning of the interview. (Doc. 202 at 15:17-19, 64:18-20). However, law enforcement agents did not tell Defendant he had to answer their questions, nor did Defendant ask to leave the bedroom or request that law enforcement leave. (Doc. 202 at 18:25-19:8, 47:6-10, 68:6-11). HSI Special Agent Edward Troy testified that he explicitly told Defendant (and that Defendant understood) that he was not under arrest and was not required to answer any questions from law enforcement:

> And it had been told to me earlier that he [Defendant] had indicated he wanted to talk, so we advised him—I advised him, which I do in the majority of these situations—that he was not under arrest, he was not required to answer any questions, he was not obligated to answer any questions that day, and if there was anything he didn't want to answer or didn't want to talk about, he wasn't forced to, and he could stop answering questions at any time.

(Doc. 202 at 65:22-66:11). Law enforcement agents also testified at the hearing that Defendant was not handcuffed during the interview or otherwise physically restrained. (Doc. 202 at 15:17-24, 35:2-4, 46:13-20, 64:18-65:7). Law enforcement agents questioned Lora for about two hours. (Doc. 202 at 16:5-6, 36:8-14).

5

"[A]s a general matter," no more than two law enforcement agents were in the room with Defendant while interviewing him. (Doc. 202 at 16:10-12). Law enforcement agents testified that they did not have their firearms drawn during the interview. (Doc. 202 at 16:17-19, 47:11-13, 65:12-14). Nor, they testified, did they threaten Defendant. (Doc. 202 at 65:15-16). The door of the bedroom was open during the interview, and no law enforcement agent blocked the door. (Doc. 202 at 17:4-5, 29:8-11, 68:2-5). The law enforcement agents sat on one of the beds while interviewing Lora and were slightly closer to the door than Lora.[1] (Doc. 202 at 29:1-7, 67:21-25).

Initially, Defendant was cooperative during the interview. (Doc. 202 at 17:19-21, 68:23-24). He told law enforcement that co-Defendant Santos had sometimes asked him to receive packages, and that he had called or texted his sister about the package delivered that day and asked her about the package. (Doc. 202 at 18:8-11, 34:5-9). He let law enforcement agents look at his cell phone, but the call and text logs showing such a contact with his sister were missing. (Doc. 202 at 18:12-19, 69:2-4).

Special Agent Troy testified that as the interview went on, he began to view Defendant as a potential suspect. He left the bedroom to confer with his supervisors on this development and was replaced by CBP Officer Nicholas Feil in the bedroom for a short period. (Doc. 202 at 45:10-22, 69:9-24). Around this time, with Officer Feil and Postal

---

[1] However, one law enforcement agent who was only present in the room with Defendant for a short period testified at the hearing that Lora was closer to the door. (Doc. 202 at 46:4-8).

Inspector Heinke in the room, Defendant became agitated, "was throwing himself on the floor, [Defendant] said, It's all mine, or something along that line, arrest me." (Doc. 202 at 19:12-24, 48:1-6). Officer Feil placed handcuffs on Defendant and told him to calm down. (Doc. 202 at 48:7-20).

Shortly thereafter, Special Agent Troy returned to the room and advised Lora of his *Miranda* rights. (Doc. 202 at 19:17-20:5, 71:1-10). Special Agent Troy testified that Defendant "did not give an indicator whether he understood or waived," and law enforcement stopped the interview. (Doc. 202 at 71:7-12). Defendant was arrested (Doc. 202 at 71:13-16) and later indicted (Doc. 84, Doc. 159).

On May 26, 2015, law enforcement subsequently obtained search warrants for the cellular telephones and GPS devices seized from the Peace Street residence, including Defendant's cell phone. (Doc. 190 at 7-8, Doc. 198-5).

### III. Discussion

Defendant advances three arguments in his Motion to Suppress to suppress all of the evidence collected by law enforcement agents before and after the March 30, 2015 search of the Peace Street residence. The Court will address each argument in turn.

### A. The Initial Search of the Package By CBP Officers Was a Legal Border Search.

Defendant first argues that CBP's initial search of the package at JFK International Airport was not authorized by law and was conducted without a warrant, and so evidence obtained from the search of the package should be suppressed. (Doc. 187 at 5).

7

Defendant further argues that the evidence obtained from the search of the Peace Street residence, the search of Lora's cell phone, and the statements made by Lora to law enforcement should be suppressed as the "fruit of the poisonous tree," *Segura v. United States*, 468 U.S. 796, 804 (1984), because the Government would not have obtained warrants for the entry and search of the Peace Street residence, and thus the actual evidence obtained from the execution of the warrants, but for the initial illegal search of the package. (Doc. 187 at 5-6).

The Government responds that federal statutes and regulations authorized CBP to conduct the initial search of the package at JFK International Airport as a legal, constitutional border search, and that further, "having asserted repeatedly that the package did not belong to him, Lora has failed to demonstrate a reasonable expectation of privacy in its contents." (Doc. 190 at 10).

After the November 13, 2018 hearing, Defendant argues in supplemental briefing that the Government "did not, however, establish the occurrence of a border search or of its lawfulness at the hearing" because counsel for Defendant objected to the introduction of the only testimony "on the grounds of a lack of foundation and the objection was sustained by the court." (Doc. 206 at 2). The Government replies that Defendant did not properly raise this issue in advance of the suppression hearing, nor did he ever actually dispute at the hearing whether a border search occurred. The Government posits that it is a matter of undisputed fact that the search of the package occurred at JFK International Airport. (Doc.

209 at 3-6). In response, Defendant *sua sponte* submitted a second reply brief further arguing that it was the burden of the Government to prove at the hearing that "the evidence was in fact seized at a lawful border search" and that Defendant had a legitimate expectation of privacy in the package because it was addressed and delivered to him. (Doc. 210 at 2-3).

The Court finds that the search of the package was a proper border search authorized by the Constitution and applicable law. The starting point for the Court's analysis is the Fourth Amendment, which prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. While warrants, based upon probable cause, can be obtained to establish the reasonableness of a search or seizure, "neither probable cause nor a warrant has ever been necessary to effect a search at the border." *United States v. Glasser*, 750 F.2d 1197, 1201 (3d Cir. 1984). The Supreme Court in *United States v. Ramsey* explained that border searches are presumptively reasonable based on "the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). The "'[border search exception] is a longstanding, historically recognized exception to the Fourth Amendment's general principle that a warrant be obtained." *Id.* at 621. International airports can be considered "the 'border' for purposes of border searches." *Id.* at 609 n.2.

In addition to the constitutional basis for border searches made without warrants, and as the Government notes in its brief in opposition to the Motion to Suppress, numerous

9

statutory and regulatory provisions authorize federal officials to search packages entering the United States without a warrant and without any particularized level of suspicion, such as probable or reasonable cause. *See* 19 U.S.C. § 1582 (authorizing Secretary of the Treasury to prescribe customs regulations for the search of "persons and baggage"); 19 C.F.R. § 162.6 (customs regulation stating "[a]ll persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer"); 19 C.F.R. § 162.11 (customs regulation authorizing seizure without a warrant of "merchandise which has been imported contrary to law"); 19 C.F.R. § 145.2(b) (customs regulation stating "[a]ll mail arriving from outside the Customs territory of the United States which is to be delivered within the Customs territory of the United States . . . is subject to Customs examination"); 19 C.F.R. § 145.1 (defining mail articles as "any posted parcel, packet, package, envelope, letter, aerogramme, box, card, or similar article or container").[2]

Applying many of these statutory and regulatory provisions in denying a motion to suppress the results of a search of a package by customs officials mailed from Jamaica that entered the country through the Miami, Florida post office, the Third Circuit in *Glasser* found that "under the Constitution and the applicable statutes and regulations, Customs has the

[2] The Court notes that, in instances involving "sealed letter class mail," customs officials need to have "reasonable cause to suspect the presence of merchandise or contraband" to open and examine the mail. 19 C.F.R. § 145.3(a). Neither the Government nor Defendant suggest that the package in question here is "sealed letter class mail," but even if it is, the package's mailing label and customs declaration listed its contents as artwork. (Doc. 190 at 12 n.2, Doc. 198). Thus, customs officials would have had "reasonable cause to suspect the presence of merchandise" to open and examine the package.

authority to search packages without articulating a 'reasonable cause to suspect' [and without a warrant]." *Glasser*, 750 F.2d at 1200. The court of appeals held that 19 U.S.C. § 1582, 19 C.F.R. § 162.6, and 19 C.F.R. § 145.2(b) were the authorities that governed in permitting the customs official, without a warrant or reasonable suspicion, to open the packages in question and examine the contents, carved wooden heads which were filled with hashish oil. 750 F.2d at 1199, 1202-05.

Here, the undisputed factual record indicates that CBP executed a proper border search of the package addressed to Lora in a manner like the legal border search in *Glasser*. As an initial factual matter, the Court rejects the argument presented by Defendant in his post-hearing briefing that it has not been established that a border search occurred. In his opening brief supporting his Motion to Suppress, Defendant concedes that CBP searched the package at JFK International Airport. (Doc. 187 at 1). Additionally, evidence admitted at the hearing also established that CBP searched the package at JFK International Airport. (Doc. 198-3 ¶¶ 7-9 (affidavit supporting issuance of tracking warrant), Doc. 202 at 59:6-60:8); *see, e.g., United States v. Robinson*, 663 F. App'x 215, 218 (3d Cir. 2016) (citing *United States v. Raddatz*, 446 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.")).

Further, Defendant's reliance on an inapposite customs regulation only permitting customs and postal officials to inspect items for export from the country, rather than import

to the country, does not advance his argument that the search of the package was improper. 15 C.F.R. § 758.7.[3] The established facts indicate that CBP properly searched the package pursuant to its legally-granted authority. *See* 19 U.S.C. § 1582; 19 C.F.R. § 162.6; 19 C.F.R. § 162.11; 19 C.F.R. § 145.2(b); 19 C.F.R. § 145.1. Accordingly, the Court will not suppress the results of the search of the package, nor will it suppress the results of the search of the Peace Street residence on the grounds that they were the "fruit of the poisonous tree."[4]

### B. THE TRACKING, ANTICIPATORY SEARCH AND SEIZURE, AND CELL PHONE SEARCH WARRANTS WERE BASED ON SUFFICIENT PROBABLE CAUSE.

Defendant's second argument, raised in the Motion to Suppress but not a subject of the November 13, 2018 evidentiary hearing, is that there was insufficient probable cause to support the issuance of the tracking, anticipatory search and seizure, and cell phone search warrants. Defendant argues that probable cause is lacking because the affidavits used to support the warrant applications to Magistrate Judge Mehalchick did not contend that Defendant, the Peace Street residence, or Defendant's cell phone were somehow involved in illegal drug-related activity. (Doc. 187 at 6-7).

---

[3] The Court notes that the affidavits used to support the issuance of the warrants cites 15 C.F.R. § 758.7 as the authority for CBP officers "to inspect items in shipment to verify the items specified in the Shipper's Export Declaration." (*E.g.*, Doc. 198-3 ¶ 7). This citation to an inapplicable regulation in the affidavits does not undercut the authority of CBP to inspect packages like the one at issue here without a warrant.
[4] Because the Court finds that the Government has established that the search of the package without a warrant was a legal and constitutional border search, it is unnecessary to address the arguments of the parties regarding disputed claims of ownership of the package in assessing Defendant's standing to raise a Fourth Amendment argument that he had an expectation of privacy in the package.

The Government responds that Defendant "misses the point of both [the tracking and anticipatory search and seizure] warrants," which is not that "[Defendant] was involved in criminal activity, but rather that *the package* was used to facilitate criminal activity." (Doc. 190 at 15-17) (emphasis in Government's brief). Additionally, the Government argues that Defendant is incorrect regarding the factual circumstances surrounding the cell phone warrant, which was issued nearly two months after the search of the Peace Street residence, and was clearly supported by probable cause due to the evidence that law enforcement gathered during the search of the Peace Street residence. (Doc. 190 at 19-20). Alternatively, the Government argues, law enforcement relied in good faith on the warrants if the Court finds that they were improperly issued. (Doc. 190 at 20-21).

Defendant's probable cause arguments are bereft of any legal or factual support, and the Court will reject them. The Court's starting point is again the Fourth Amendment, which prescribes that warrants can only be issued "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court, in *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983), affirmed a "totality-of the-circumstances" approach in determining probable cause to issue a search warrant, and a deferential approach to reviewing a magistrate judge's probable cause determination:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or

> evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Id.* (citing *Jones v. United States*, 362 U.S. 257, 271 (1960), *overruled on other grounds* by *United States v. Salvucci*, 448 U.S. 83 (1980)). "The supporting affidavit [in an application for a warrant] must be read in its entirety and in a common sense and nontechnical manner." *United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993) (citing *Gates*, 462 U.S. at 230-31). Anticipatory search warrants, which subject their execution to a triggering condition, are constitutionally permissible if supported by probable cause to indicate that there is a "fair probability that contraband or evidence of a crime will be found in a particular place" if the triggering condition occurs and "there is probable cause to believe the triggering condition *will occur.*" *United States v. Grubbs*, 547 U.S. 90, 94-97 (2006) (internal quotations omitted, emphasis in original) (citing *Gates*, 462 U.S. at 238) (upholding anticipatory search warrant to search a location where a successful controlled delivery was made of child pornography ordered from a website operated by an undercover postal inspector).

The Court finds that the affidavits submitted in support of the tracking, anticipatory search and seizure, and cell phone search warrants provided a substantial basis to support the finding of probable cause by Magistrate Judge Mehalchick to issue the warrants. The affidavits describe the initial search of the package at JFK International Airport and the discovery of illegal drugs in the package. (Doc. 198-3 ¶¶ 6-11, Doc. 198-4 ¶¶ 10-19, Doc.

14

198-5 ¶¶ 7-9). The tracking and anticipatory search and seizure warrant affidavits further explain the need for the warrants in that the package itself "is being used, and will continue to be used, to facilitate" violations of federal law, including drug trafficking. (Doc. 198-3 ¶ 13, Doc. 198-4 ¶ 17). The tracking warrant affidavit describes the need for the GPS tracking device and the "entry-detection" device, as the package could be moved from the original delivery location and could be opened by a different "ultimate recipient." (Doc. 198-3 ¶¶ 15-17). The anticipatory search and seizure warrant affidavit explains the conditions precedent for executing the warrant ("a successful controlled delivery of the target package to the target location and the physical introduction of the target package into the target location"), and describes with specificity the types of items that might be found at the Peace Street residence and that could be seized as "evidence, fruits and instrumentalities" of the federal crimes that are the subject of the investigation. (Doc. 198-4 ¶¶ 5-6, 21-22, Att. A). And the cell phone search warrant, issued weeks after the search of the Peace Street residence and the discovery of the drugs and weapons in the home, describes the need for the warrant, recounts the search of the Peace Street residence and the discovery of contraband and the recovery of cell phones in the residence, and specifies the cell phones and GPS devices to be searched. (Doc. 198-5 ¶¶ 2, 11-12, Att. A, Att. B).

Read in their totality, the affidavits provide ample support for the Magistrate Judge's probable cause determination. As the Government contends, contrary to Defendant's framing, the tracking and anticipatory search and seizure warrant affidavits' "probable cause

15

was not premised on an allegation that he was involved in criminal activity, but rather that *the package* was used to facilitate criminal activity." (Doc. 190 at 17 (emphasis in the Government's brief)); *Conley*, 4 F.3d at 1206-07 (distinguishing arrest warrants from search warrants and noting that there was probable cause to search a premises where evidence of a crime or contraband could be present). It is not an unfair or illogical conclusion to find that a residence to which a package containing illegal drugs is delivered and opened has "a fair probability" to contain "evidence of a crime; contraband, fruits of crime, or other items illegally possessed; [or] property designed for use, intended for use, or used in committing a crime." *See* Fed. R. Crim. P. 41(c); *Gates*, 462 U.S. at 238-39; *Grubbs*, 547 U.S. at 95-97. Nor was the Magistrate Judge without a substantial basis to find that a cell phone owned by the Defendant found in a residence containing contraband had a fair probability of containing evidence of a crime. Accordingly, the Court will not suppress the results of the search of the Peace Street residence or Defendant's cell phone on the grounds that the warrants were based on insufficient probable cause.[5]

## C. DEFENDANT WAS NOT IN CUSTODY DURING THE INTERVIEW WITH LAW ENFORCEMENT, AND SO HIS STATEMENTS ARE ADMISSIBLE.

Defendant's final argument, the focus of most of the November 13, 2018 hearing, is that the statements he made to law enforcement agents "on March 30, 2015, [were] involuntary and the result of unconstitutional custodial interrogation." (Doc. 187 at 10). He

---

[5] As the Court finds that the warrants were supported by sufficient probable cause, it is unnecessary to analyze the Government's argument in the alternative that law enforcement had a good faith basis to rely on the warrants.

16

argues that the testimony elicited at the November 13, 2018 hearing "establishes that a reasonable person would not have felt free to end the questioning and leave," and so he was in custody and statements made to law enforcement without receiving *Miranda* warnings should be suppressed. (Doc. 206 at 3-5). The Government responds that the totality of the circumstances indicate that Defendant was not in custody at the time he gave his statements to law enforcement. (Doc. 190 at 22-28, Doc. 209 at 7-13).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'" *Pennsylvania v. Muniz*, 496 U.S. 582, 589, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990) (quoting *Miranda v. Arizona*, 384 U.S. 436, 461, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). To ensure these rights are protected, the Supreme Court has held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. Commonly known as "*Miranda* rights" or "*Miranda* warnings," a defendant in police custody

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479.

Implicit in the above is that "police officers are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). Instead, "*Miranda* . . . requires warnings only when the person the police are questioning is in custody." *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006). Stated otherwise, "[n]o *Miranda* warning is required absent a 'custodial interrogation.'" *United States v. Savage*, 677 F. Supp. 2d 756, 763 (E.D. Pa. 2009); *see also Miranda*, 384 U.S. at 444. "Because the presence of *both* a custodial setting and official interrogation is required to trigger the *Miranda* right-to-counsel prophylactic, absent one or the other, *Miranda* is not implicated." *Alston v. Redman*, 34 F.3d 1237, 1244 (3d Cir. 1994) (emphasis in original).

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (footnote omitted). Here, the parties do not dispute that the interview that took place between law enforcement agents and Defendant satisfied the interrogation prong of the custodial interrogation analysis. Thus, the only question before the Court is whether Defendant was in custody when he was interrogated by law enforcement agents.

"As used in . . . *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012). A person is in custody for purposes of *Miranda* when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983) (quoting *Mathiason*, 429 U.S. at 495); *see also Willaman*, 437 F.3d at 359. "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) (footnote omitted). Further, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994).

"[I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974); *see also Willaman*, 437 F.3d at 359; *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999). Nevertheless, while the

term "'custody' must not be read too broadly," it is "beyond doubt that a custodial interrogation may occur outside the police station." *Leese*, 176 F.3d at 743.

The Third Circuit has identified five factors a court must consider when determining whether a person was in custody for purposes of *Miranda*:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*Willaman*, 437 F.3d at 359-60; *see also United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010).

Here, there is no dispute that Defendant was not advised of his *Miranda* rights before he was interviewed by law enforcement agents. Nevertheless, upon consideration of the above factors, the Court finds that Defendant was not in custody at the time of questioning and therefore *Miranda* was not implicated.[6]

The first factor, whether Defendant was told he was under arrest or free to leave, favors the Government's position. HSI Special Agent Troy testified at the November 13, 2018 hearing that at the beginning of the interview of Defendant:

> [I]t had been told to me earlier that he [Defendant] had indicated he wanted to talk, so we advised him—I advised him, which I do in the majority of these situations—that he was not under arrest, he was not required to answer any questions, he was not obligated to answer any questions that day, and if there

---

[6] It is worth noting the Defendant cites no relevant case law in any of his submissions to support his arguments that the *Willaman* factors weigh in his favor.

was anything he didn't want to answer or didn't want to talk about, he wasn't forced to, and he could stop answering questions at any time.

(Doc. 202 at 65:22-66:11). Other law enforcement agents present at the interview testified that they did not tell Defendant he had to answer their questions, nor did Defendant ask to leave the bedroom or request that law enforcement leave. (*Id.* at 18:25-19:8, 47:6-10). This testimony was uncontroverted. Thus, this factor suggests Defendant was not in custody during the interview.

Next, the second factor, the location of the interrogation, on balance does not weigh in favor of or against finding Defendant was in custody. On one hand, Defendant was questioned in his home, in a children's bedroom with an open door, with no law enforcement agent blocking the way out. *See United States v. Killingsworth*, 118 F. App'x 649, 651 (3d Cir. 2004) ("[T]he fact that the incident took place in Appellee's home undermines a claim that he was in custody"); *United States v. Vidal*, 85 F. App'x 858, 861-62 (3d Cir. 2004) (holding that a defendant was not in custody when he was questioned in his home); *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) ("When a person is questioned on his own turf, we have observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation" (internal citation and quotation marks omitted)).

On the other hand, there were multiple law enforcement officers walking through and searching the house and Defendant was separated from the other occupants of the house while being questioned. *See Miranda*, 384 U.S. at 449-50 (noting procedures used by law

21

enforcement to obtain statements during interrogations emphasize that "the 'principal psychological factor contributing to a successful interrogation is privacy—being alone with the person under interrogation'") (citation omitted); *United States v. Fautz*, 812 F. Supp. 2d 570, 619 (D.N.J. 2011) (finding a defendant was in custody when he was questioned in "his own home, but at that time the entire premises was visibly subject to the unquestioned command of the officers"). The Government contended at the evidentiary hearing that it was likely that Defendant was taken to the upstairs bedroom for the interview rather than being left on the ground floor with the rest of the occupants of the house because law enforcement was conducting a search of the house and it was a "quieter setting in the children's room." (Doc. 202 at 79:1-8). With these competing facts, the Court cannot find that the second factor weighs in favor of either side.

Turning to the third factor, the length of the interrogation, "courts have found interrogations lasting anywhere from one and one-half to seven hours to be non-custodial." *Killingsworth*, 118 F. App'x at 651-52 (citing cases). While the Court does not view two hours of questioning as inconsequential, the case law in this circuit does not support the proposition that the length of the interrogation in this case supports a finding that Defendant was in custody. *See, e.g., United States v. McKinney*, 695 F. Supp. 2d 182, 191 (E.D. Pa. 2010) ("[T]he Court notes that the length of time of the search—nearly five hours—weighs slightly in favor of a finding of custody"). At best, this factor benefits neither party's position. *See United States v. Griffin*, 922 F.2d 1343, 1348-49 (8th Cir.1990) ("The length of the

interrogation has been a similarly undeterminative factor in the analysis of custody.") (citing cases).

Next, the Court finds that the fourth factor, whether the police use coercive tactics, indicates that Defendant was not in custody. Defendant was not handcuffed during the interview or otherwise physically restrained. Law enforcement agents did not have their firearms drawn during the interview. They did not threaten the Defendant, and he was cooperative during the interview. Thus, on a whole, this factor supports the Government's position. *See Killingsworth*, 118 F. App'x at 652.

The fifth and final factor factor, whether Defendant voluntarily submitted to questioning, also supports a finding that Defendant was not in custody. Defendant voluntarily agreed to be interviewed by law enforcement agents. As stated previously, Special Agent Troy specifically told Defendant at the beginning of the interview he was not under arrest and was not required to answer any questions. Law enforcement agents questioned Defendant for nearly two hours before he suddenly became agitated and made incriminating statements telling law enforcement that the drugs were his. At this point, the agents Mirandized him, ended the interview, and arrested Defendant. The Court finds that this factor supports the Government's position. *See Killingsworth*, 118 F. App'x at 652 (holding that the fifth factor supported a finding that the defendant was not in custody when "[n]othing indicate[d] that the incident involved the type of physical intimidation or psychological coercion which would render Appellee's statements involuntary").

Considering the totality of the circumstances, the questioning of Defendant in his home on March 30, 2015, did not create the type of inherently coercive environment for which *Miranda* was meant to address. Instead, based upon the balance of the factors discussed above, the Court holds that Defendant was not in custody for *Miranda* purposes at the time of questioning and that the law enforcement agents were therefore not required to advise Defendant of his *Miranda* rights prior to questioning him. Accordingly, Defendant's statements were not taken in violation of his Fifth Amendment rights and are therefore not subject to suppression.

## IV. Conclusion

For the reasons outlined above, the Court will deny Defendant's Motion to Suppress. A separate Order follows.

Robert D. Mariani
United States District Judge